THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRYAN BLAKE, Appellant.

First Department, July 14, 1988

## APPEARANCES OF COUNSEL

*Kathleen E. Fay* of counsel *(Norman Barclay* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Virgil Hervey* of counsel *(Peter Matsoukas* with him on the brief; *Hervey, Matsoukas & Schuman,* attorneys), for appellant.

## OPINION OF THE COURT

CARRO, J.

This was a close and wholly circumstantial evidence case, requiring the jury to engage in a very complex and difficult reasoning process. That deliberative process was made even more difficult by the crime involved herein, a ghastly and incomprehensible murder. These factors magnified the prejudicial impact of certain trial errors which, in combination, require a reversal of this conviction and a remand for a new trial.

At approximately 8:15 A.M. on August 2, 1985, Police Officer Jose Oquendo, after following a trail of blood leading to the apartment of Thomas Barnes, entered the unlocked apartment and saw a most gruesome sight: the body of Barnes lying face up on the floor with a knife protruding from the abdomen, his throat slit, his genitals cut off and stuffed in his mouth, and multiple knife wounds throughout the body. The autopsy revealed that Barnes had been stabbed 54 times, with 16 of those stab wounds inflicted to the right side of the face and neck alone. Near the body was another knife and a bloodied and ripped tank top shirt bearing the number 12. On August 21, 1985, defendant was arrested for the murder of Barnes, based on information placing him with Barnes the night of the murder and linking him to the tank top shirt.

Defendant argues that the circumstantial evidence was insufficient, as a matter of law, to warrant his conviction for murder. We have carefully reviewed the evidence and find that the inferences to be drawn from the evidence were sufficient to enable a jury to exclude to a moral certainty every other hypothesis but defendant's guilt. Nevertheless, a review of the facts is necessary to appreciate the prejudicial impact of the various trial errors which deprived defendant of his right to a fair trial.

On August 1, 1985, Lawrence Garvie went to the Rawhide Bar in Manhattan to meet friends. While there, his attention was drawn to a man he described as well-built, dark-haired, with a trimmed mustache, about 25 or 26 years old, wearing a pale yellow tank top shirt bearing the number 12 on front and back.* At about 8:00 or 8:30 P.M., Garvie engaged the man in conversation and learned from him that he had a one-syllable Irish surname, which Garvie could not recall, was half Italian and half Irish, 32 years old, lived in Queens, and patronized the bar Billy the Kid's in Queens. The men were later joined by Garvie's friend Thomas Barnes. When the man in the tank top shirt mentioned having a friend from St. Louis, Missouri, Barnes, a St. Louis native, fell into a "very animated" discussion with the man. When Garvie left the bar at about 10:30 P.M., Barnes and the man were still talking. At about midnight, Miguel Erazo, who was also at the bar, saw Barnes

---

* On August 21, 1985, the day of defendant's arrest, Garvie viewed a lineup which included defendant and stated that defendant looked very much like the man in the tank top shirt, particularly in his build and coloring. Garvie could not, however, make a definite identification because defendant wore his hair differently and had no mustache.

leave the Rawhide with a man wearing a white tank top shirt, bearing the number 12.

At about 12:50 A.M. on August 2, 1985, Paul Hawkins, who lived in the apartment below Barnes', heard a groan and "scuffling" noise. About a half hour later, he heard someone stumble down the stairs from the floor above, which was the building's top floor. The next morning, at about 8:00 A.M., as Hawkins was leaving to work, he saw blood on the walls outside his apartment and noticed that the blood led all the way upstairs. He went upstairs and saw that Barnes' door was open. He alerted Barnes' neighbor and went to work. Shortly thereafter, the police arrived, finding the deceased and the tank top shirt. At trial, both Garvie and another person who had been at the bar identified the shirt as the one Barnes' companion wore.

The People also introduced at trial two exculpatory out-of-court statements defendant had made in order to demonstrate his consciousness of guilt. One was made to the arresting officer, while the other was a videotaped statement made to the prosecutor who tried the case. In his statement to Detective Morin, defendant admitted that he was half Irish and half Italian. Though he currently had no permanent residence, he spent his time either in Queens with a Mr. Ding or in Brooklyn with a Gary. Defendant stated that he had previously been living with a lover from St. Louis, Missouri, but then corrected himself, saying his former lover was from Michigan. He claimed to have spent the night of August 1, 1985 at an apartment on Christopher Street in Manhattan and then went to see his sister in New Jersey on the next day. He recalled having been at the Rawhide "maybe six months to a year" ago and that he may have played pool there with Barnes. He insisted, however, that he never wore tank tops and had not had a mustache in the past five years.

In the videotaped statement to the prosecutor, defendant accounted for his whereabouts on August 1 and August 2. This time he claimed to have spent the evening of August 1, 1985 in Queens. In speaking to the prosecutor, defendant realized that he had been mistaken in telling Detective Morin that he had stayed overnight at an apartment on Christopher Street. Defendant was adamant that he would never wear a shirt like the one found in the apartment. While he may have gone without shaving in early August for a few days, he was sure that he could not be accurately described as having had a

mustache. Throughout the questioning, the prosecutor made numerous comments about the evidence.

In rebuttal to defendant's statement that he never wore tank tops and had not had a mustache for some time, the People elicited certain testimony from two witnesses, Harry Whitcomb and Paul Herzog. Harry Whitcomb, who had seen defendant about 15 or 20 times during 1985 at Billy the Kid's, had seen defendant wear a shirt exactly like the one found in Barnes' apartment. In fact, on about 10 or 12 occasions, he saw defendant wear a tank top shirt bearing the number 12. When Whitcomb saw defendant last, in either late July or early August, he noticed that defendant had grown a "little mustache". Paul Herzog, the bouncer at Billy the Kid's, knew defendant as a "regular pool player" and had seen him wear shirts similar to the one recovered at the murder scene. He had also, on occasion, seen defendant with a mustache.

■ Although we find that this evidence was sufficient, as a matter of law, to support the jury's verdict, we have serious doubts that the jury was able to accord the evidence its proper weight given the prejudicial nature of certain trial errors. Foremost of these errors was the prosecutor's violation of the unsworn witness rule when he introduced into evidence the videotaped statement complete with certain improper statements he made concerning the case. A prosecutor becomes an unsworn witness when he injects his own credibility into the trial or "express[es] his personal belief on matters which may influence the jury" *(People v Paperno,* 54 NY2d 294, 300). The rationale for limiting such conduct is that it "amounts to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination. Hence, the rule is founded upon the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor" *(supra,* at 301).

We are unable to discount the strong possibility that certain of the prosecutor's remarks made during the videotaped session may have indeed influenced the jury in rendering its verdict. In a tone implying that the prosecutor believed defendant was lying, the prosecutor warned defendant that "[t]here are certain things we know about you and other people that it would be foolish for you to hide them." Despite the fact that a disputed and material issue at trial was whether defendant had a mustache on August 1 and 2, 1985, the jury heard the prosecutor say, "we know that you had a mustache on or

about the third of August, if you want to deny that, that's up to you, but I'm telling you that we know there are people that know you."

With reference to perhaps the most critical piece of evidence in the case, the tank top shirt found in Barnes' apartment, the prosecutor stated: "you certainly can't tell me that that is not your shirt, or you don't have a shirt * * * like that shirt, because there are several people who are your friends who indicate that that's 'Bryan's shirt', or one exactly like it." Again emphasizing defendant's link to the shirt, the prosecutor asserted that the State did not need other evidence, because "we [found] your shirt in the apartment."

At a later point in the videotaped session, the prosecutor formulated a motive for the killing. He told defendant that he and the detectives were "pretty sure" that defendant killed Barnes because he had forced defendant to perform oral sex, which defendant did not like to do. The prosecutor told defendant that he was "lying about things that I know we can prove so easily." In response to defendant's sarcastic comment that the State had to prosecute someone, the prosecutor replied: "No, we have to prosecute the right person not just anybody."

These statements constituted expressions of personal belief about the strength of the People's evidence against defendant and personal disbelief as to defendant's credibility on certain material matters. Some of these statements were particularly harmful because they had the likely effect of bolstering the People's case on specific disputed issues: whether the tank top shirt found in the apartment belonged to defendant and whether defendant had a mustache on the night of the murder. In this close case it was critically important that the jurors be able to consider the evidence on these key matters free of the danger that they would accord undue weight to the prosecutor's personal expressions of belief. We believe, however, that this danger was clearly present in this case, thus depriving defendant of his right to a fair trial.

■ Contrary to defendant's argument, however, that the prosecutor should have recused himself, we conclude that the appropriate remedy would have been redaction of the improper comments. *(See, People v Paperno, supra,* 54 NY2d, at 303.) It is of no consequence that defendant failed to request

redaction. He did move prior to trial to have the prosecutor recused pursuant to *Paperno* because of his participation in the statement. Because *Paperno* places the responsibility on the trial courts to consider less drastic alternatives than recusal, such as redaction of portions of confessions *(supra)*, defendant's pretrial motion for recusal pursuant to *Paperno* was sufficient to preserve this issue for appellate review. In fact, we note that the trial court stated that it was very familiar with the *Paperno* decision. In any event, due to the closeness of the case, we would have exercised our discretion to reach this issue in the interest of justice. *(See,* CPL 470.15 [3] [c]; [6] [a].)

■ One additional error must be addressed. Over defense counsel's strenuous objection, the court permitted into evidence 22 color photographs of the murder scene, including several gruesome, close-up pictures of the decedent's mutilated body. This court has viewed these photographs and finds it difficult to imagine that these photographs would not have horrified even the most impassive of persons. Neither can we discern any probative value that these photographs could have which would be sufficient to outweigh their extremely inflammatory and prejudicial effect. The medical testimony adequately described the state of the decedent's body and the cause of death, and this sufficed to prove beyond any doubt that the decedent was murdered and suffered a horrible death. There is no question on these facts as to the degree of murder committed. The only question was whether this defendant was the murderer, and as to that question, these photographs were absolutely irrelevant. We conclude, then, that the photographs were introduced for no other reason than "to arouse the emotions of the jury and to prejudice the defendant". *(People v Pobliner,* 32 NY2d 356, 370.) This deprived defendant of his right to a fair trial, and his conviction must be reversed.

We have reviewed defendant's other points and find them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (Edwin Torres, J.), rendered December 5, 1985, convicting defendant, after a jury trial, of murder in the second degree and sentencing him to an indeterminate term of imprisonment of from 25 years to life, is unanimously reversed, on the law, and as a matter of discretion in the interest of justice, and the matter is remanded for a new trial.

KUPFERMAN, J. P., ROSS, ELLERIN and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on December 5, 1985, unanimously reversed, on the law, and as a matter of discretion in the interest of justice, and the matter is remanded for a new trial.