[857 NYS2d 126]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD MOYE, Appellant.

First Department, May 8, 2008

---

### APPEARANCES OF COUNSEL

*Anthony L. Ricco,* New York City, for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Mark Dwyer* of counsel), for respondent.

### OPINION OF THE COURT

CATTERSON, J.

In this case, we vacate a conviction and remand for a new trial because the prosecutor's conduct at trial amounted to an egregious violation of the unsworn witness rule. The form and substance of the prosecutor's summation whereby he injected himself, his pretrial conduct and his credibility into the proceedings were highly prejudicial to the defendant, and constituted prosecutorial misconduct that the trial judge impermissibly allowed over objection. We do not agree with the dissent's viewpoint, characterizing the People's summation as a "vigorous" response to defense counsel's closing argument. This is not a case about the limits that should be set on prosecutorial

response to a defendant's aggressive, or even, egregious summation. This is a case where the People created the situation by eliciting conflicting testimony from their own witnesses, and then attempted to correct the situation at sidebar by vouching to the court for the witness whose testimony was more likely to secure them a conviction. After the court denied a mistrial, defense counsel properly pointed to the conflicting testimony, and suggested that the police officer witness had lied with the prosecutor's complicity. Moreover, this was defendant's second trial on a single count of criminal possession of a controlled substance in the third degree. The first attempt by the same prosecutor, Assistant District Attorney (ADA) Chao, to convict the defendant resulted in a mistrial, as the jury was unable to reach a verdict. During the first trial, defense counsel impeached photographs introduced by the prosecution, which purported to depict the position of the defendant's car on West 118th Street as it was claimed to have been observed during a nighttime rooftop surveillance. Defense counsel asserted that the photographs clearly demonstrated that, from their vantage point, observing police officers could not have seen the defendant's hand extend from his car, and so they could not have viewed the defendant handing over drugs to codefendant Mumford.

After members of a backup team reached the scene, they arrested Mumford and the defendant, who was standing next to the car. The car was searched, and it was discovered that the airbag had been removed from the passenger side of the vehicle. In the cavity created from its removal, four packets of marijuana were found. In the car and defendant's pockets, more than $1,000 in cash was found.

After the case was sent to the jury, a mistrial was declared when the jury could not agree on a verdict. By the time of the retrial, the prosecution had obtained new photographs in a re-creation of the drug arrest purporting to show Officer Jeselson's vantage point from his observation post. The part of the defendant was played by a second police officer parked in the spot where the defendant's car allegedly was parked on the night of the crime, and the officer extended his hand from the vehicle, apparently to establish that the hand was visible from the observation post.

Testimony at the retrial established that the photographs were taken by an employee of the District Attorney's office, Laura Badger, in the presence of Assistant District Attorney Chao, Officer Jeselson, and another officer.

Notably, during the retrial, Officer Jeselson testified that his fellow officer's hand was visible from the observation post. Badger testified differently. She said that Officer Jeselson advised the driver of the police car to move the car to a different position after it was, initially, impossible to see the second officer's hand from the observation post.

During a sidebar, the prosecutor had "no explanation" for Ms. Badger's testimony other than that she was mistaken. The prosecutor claimed to be as surprised as anyone else by the testimony.

During summation, defense counsel accused Officer Jeselson of perjury. Referring to Ms. Badger, defense counsel stated: "We know who Ms. Badger is. Ms. Badger is their expert. She works for Mr. Morgenthau. She told you Mr. Morgenthau expects a high level of integrity from the people who work for him. Very important because Mr. Morgenthau has a great level of integrity."

After discussing Ms. Badger's testimony, defense counsel again stated that someone was committing perjury, and then added:

> "[The prosecutor] Mr. Chao will tell you this. Those are gross inconsistencies . . .

> "Defense calls witnesses and they lie, the prosecution calls it perjury. When the prosecution calls witnesses that lie they call it inconsistencies . . .

> "Mr. Chao tried to get back up and straighten it out. He knew what was going on. He had to fix it. He was there, wasn't he? According to Ms. Badger, according to Officer Jeselson standing right there. The case is going down the drain. So what does he do? He doesn't throw the towel in, no. He gets up."*

Defense counsel went on to suggest that the prosecutor, during his redirect, tried to throw Ms. Badger a signal that she had made a mistake, and that she wasn't supposed to say that, but Ms. Badger did not react to the signal.

In his summation, the prosecutor responded that Officer Jeselson had no opportunity to frame the defendant, because his acts during the re-creation at the observation post were being witnessed by an assistant district attorney. ADA Chao argued:

---

* The reference about "getting up" was to the prosecutor's attempt to rehabilitate Ms. Badger on redirect.

"[Defense counsel] spoke about people on that roof. It's in evidence. Officer Jeselson was on that roof, the photographer Laura Badger was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.

"And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked about a lot of people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—

"[DEFENSE COUNSEL]: Mr. Chao is vouching for his witness.

"THE COURT: Overruled. . . .

"[ADA] CHAO: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE COUNSEL]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

"THE COURT: Overruled.

"[ADA] CHAO: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken. . . .

"[DEFENSE COUNSEL]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it."

After the trial concluded, the defendant moved to set aside the verdict based upon prosecutorial misconduct. The court denied the motion. The court noted that, "[v]iewed in a vacuum," the prosecutor's comments were objectionable, but viewed as a response to defense counsel's inappropriate summation, they did not rise to the level of reversible error.

On appeal, the defendant rightly contends that the prosecutor improperly vouched for his witness and interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Officer Jeselson.

It is well settled law that a prosecutor may not act as an unsworn witness and support the People's case with his or her own veracity and position. (*People v Lovello*, 1 NY2d 436 [1956].) Indeed, the prosecutor in *Lovello* may well have served as a role model for the prosecutor in this case; albeit a role that should not have been imitated. In that case, the prosecutor attempted to convince the jury that the defendant had made a self-accusatory statement to a police officer and to himself when defense counsel, in his summation, criticized the prosecutor for failing to produce the stenographic minutes even though a stenographer had been present. The prosecutor stated to the jury: "with all the sincerity at my command, I say to you that if that conversation did not take place . . . then I am an aider and abetter to [the police officer's] perjury." (*Id.* at 438-439.)

A reading of the excerpted text from the People's summation clearly illustrates that this was what the prosecutor did in this case, except to a more egregious degree. In this case, where two witnesses, both appearing for the prosecution, offered conflicting, contradictory statements about what had happened during the taking of photographs from the observation post, it was obviously defense counsel's duty to draw attention to the inconsistencies. Moreover, defense counsel correctly suggested that, because only one of the statements could be true, one of the witnesses was possibly committing perjury. Further, knowing that the same issue of whether Police Officer Jeselson was in a position to witness the defendant handing the codefendant drugs in exchange for money had led to a mistrial the first time around, it was entirely reasonable for defense counsel to sug-

gest that if perjury was being committed then the police officer had more to gain from it. In turn, this placed the prosecutor at center stage, since he was one of the parties present at the photographic session.

The prosecutor did not deny this. Indeed, he responded to defendant's comments by noting that any impropriety which purportedly occurred during this incident necessarily occurred in front of him, given his presence, but that his very presence made any impropriety unlikely. He also suggested that if he were to prosecute a case, where that type of misconduct had taken place, he should be fired. Further, the prosecutor said he had no explanation for the discrepancy, other than that Badger was mistaken.

On appeal, the People concede that the prosecutor vouched for Officer Jeselson, and that there are virtually no cases in which summation remarks, like those in this case, are made by an assistant district attorney. Nevertheless, the People argue that the prosecutor's summation was a necessary response to "a very personal defense attack" and that the prosecutor could not just "roll over" without reply.

Reliance on *People v Marks* (6 NY2d 67 [1959], *cert denied* 362 US 912 [1960]), however, would be inapposite. There, the defense counsel injected the reputations of the Assistant District Attorney, the District Attorney's office, and the police into the case, having made gratuitous blanket attacks upon the law enforcement authorities. In that case, the Court found that defense counsel had told the jury that prosecution witnesses had been suborned by the District Attorney's office acting with the police, by coercing them into giving false testimony implicating the defendant by threatening them that drugs would be withheld from them, or furnished to them, according to whether they testified as the People wanted. (*Id.* at 77.)

The Court of Appeals noted that the prosecutor's reply had to be viewed in the context of that summation. Having made the attacks he did, the Court held that defendant was not in a position to complain that the prosecuting officer said that his reputation and the reputation of the police were involved in the case. The Court found that what the Assistant District Attorney said in reply may not have been perfect, but under these circumstances it was not unduly prejudicial.

*Marks* is easily distinguishable. In this case, Officer Jeselson's credibility was at the crux of the case against the defendant since it was his testimony that established the defendant as

Mumford's accomplice. Officer Jeselson moreover testified that he had witnessed a hand-to-hand exchange between the defendant and Mumford. The visibility of the exchange was crucial to the People's case, particularly since that was the issue that had prompted a mistrial in the first trial.

Likewise, *People v Ortiz* (54 NY2d 288 [1981]) is distinguishable. In that case, the voluntariness of a defendant's statement to the prosecutor was an issue, but there was no reversible error when the court allowed the prosecutor to inject his pretrial conduct and credibility into the trial because no claim had been made that it was the prosecutor who had engaged in any coercion. *Ortiz* stands for the proposition that where a prosecutor has, in effect, become an unsworn witness and injected his or her credibility into the proceedings by virtue of the admission into evidence of the prosecutor's pretrial conduct, "no reversible error will be ascribed where such conduct does not become an actual issue at trial or otherwise result in a substantial likelihood of prejudice to the defendant." (*People v Bendell*, 111 AD2d 87, 90 [1985, Murphy, P.J., dissenting], *revd on dissenting mem of Murphy P.J.*, 67 NY2d 724 [1986].)

In this case, it is indisputable that where the credibility of the witnesses was an issue for the jury, the prosecutor vouched for the witness with the most favorable testimony for the prosecution by reference to his own pretrial conduct and by reference to his own credibility by virtue of his position in the District Attorney's office, and thus he became an unsworn witness, and that error was harmful. In *People v Paperno* (54 NY2d 294, 301 [1981]), the Court of Appeals explained the rationale for limiting such conduct by stating that it amounted to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination. The Court saw the "possible danger" that the jury, impressed by the prestige of the District Attorney's office, "will accord great weight to the beliefs and opinions of the prosecutor." (*Id.*; *see also People v Blake*, 139 AD2d 110, 114 [1st Dept 1988].)

In this case, the issue that caused the mistrial was also the issue at the heart of the conflicting testimonies in the second trial which the prosecutor attempted to resolve in the People's favor by his unsworn testimony. Thus, to allow those statements to be heard by the jury constituted reversible error. Furthermore, the trial court erred in stating to the jury, "you can accept [the prosecutor's] argument as to what happened on the roof. It's his argument based upon the evidence as he recalls it." Essentially,

the trial court gave its imprimatur to the prosecutor as unsworn witness. This was indisputably and highly prejudicial to the defendant in a close case.

Accordingly, the judgment of the Supreme Court, New York County (John A.K. Bradley, J.), rendered June 16, 2004, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and sentencing him, as a second felony offender, to an indeterminate prison term of $4^{1}/_{2}$ to 9 years should be reversed, on the law, the judgment vacated and the matter remanded for a new trial.

McGuire, J. (dissenting). A claim of prosecutorial misconduct on account of certain statements made by the prosecutor on summation is the principal issue presented on this appeal. I would affirm as I believe the prosecutor responded in a restrained manner to a reprehensible and unsupported personal attack on his integrity by defense counsel.

Defendant and David Mumford were charged by indictment with a single count of criminal possession of a controlled substance in the third degree. The evidence elicited at defendant's second trial, an earlier trial having ended in a mistrial when the jury was unable to reach a verdict, was as follows. On the evening of March 12, 2002, Officer Paul Jeselson was manning an observation post just west of Manhattan Avenue that overlooked a residential block on West 118th Street. Shortly after 7:30 P.M., using binoculars, Officer Jeselson saw an Hispanic man speak with a man later identified as Mumford. Mumford then approached a black Crown Victoria from which loud music was blaring and extended his hand toward the driver's window. A hand came out of that window and went over Mumford's hand. Mumford returned to the Hispanic man while arranging small white objects in the palm of his right hand. He gave the white objects to that man in exchange for currency.

Mumford returned to the Crown Victoria and handed currency into the car. A second Hispanic man approached Mumford and he also received white objects from Mumford in exchange for currency. Although Jeselson radioed descriptions of the Hispanic men to his backup team, neither man was apprehended. After the apparent sale to the second man, defendant emerged from the Crown Victoria. At about the same time, Mumford placed objects in a recess between two planters on the side of a building before entering another car double-parked on the block.

Members of the backup team then moved in and Mumford and defendant, who was next to the Crown Victoria, were ar-

rested. Mumford had $220 and nine glassine envelopes of heroin stamped "NFL" in his pockets; 30 more glassines stamped "NFL" were recovered from the recess between the planters. Over $4,300 was recovered from defendant and the car; at trial, however, the People were permitted to elicit only that over $1,000 was recovered from defendant. When Officer Boorman was vouchering the currency at the precinct and remarked at the amount, defendant stated that the money was just "pocket change."

Prior to the first trial, Mumford pleaded guilty as charged and was sentenced to a prison term of 1 to 3 years. Defendant's second trial, before Justice Bradley, began in May 2003. Defendant was convicted as charged on May 9, 2003 but thereafter jumped bail. On June 16, 2004, defendant was sentenced to a term of 4½ to 9 years.

The claim of prosecutorial misconduct arises from conflicting testimony given by Officer Jeselson and Laura Badger, a photographer employed by the District Attorney's office. Prior to the second trial, Officer Jeselson returned to the observation post with the Assistant District Attorney who tried the case and Ms. Badger. In accordance with the directions of Officer Jeselson, another police officer parked a police car in the spot where defendant's Crown Victoria had been parked. The driver's side window could not be seen from the observation post but Officer Jeselson instructed his fellow officer to extend his hand out that window. Photographs taken by Ms. Badger in February 2003 that were introduced at trial showed that the officer's extended hand was visible from the observation post.

On cross-examination, Officer Jeselson stated that he did not instruct his fellow officer to change the angle at which the car was parked before closeup photos showing the extended hand were taken from the observation post. Ms. Badger, however, also testified and her testimony differed from Officer Jeselson's in this regard. On re-cross-examination, Ms. Badger testified that the vehicle changed positions during the taking of the photographs. On re-redirect examination, Ms. Badger stated that Officer Jeselson advised the officer in the police car to move the car to a different position when, from the spot at which the car initially was parked, the officer's extended hand could not be seen from the observation post due, she believed, to the angle at which the car was parked.

Outside the presence of the jury, defendant made a motion "for a mistrial based upon prosecutorial misconduct." Counsel

argued that either Officer Jeselson or Ms. Badger had testified falsely; the possibility that one of the witnesses was mistaken was not mentioned by counsel. Although counsel repeatedly urged that he believed that Officer Jeselson rather than Ms. Badger was the one who had "testif[ied] falsely to a material fact," counsel also argued that defendant was entitled to a mistrial because either one or the other witness had testified falsely "and because it was done by the prosecutor who was present [in the observation post] and present in this courtroom at the time of the testimony."

In response, the prosecutor expressed his surprise at the photographer's testimony, and said that he could explain it only as a failure of memory on her part. He confirmed that he was present in the observation post when the photographs were taken and added that his "nightmare" had been that he was "prosecuting a lie" at the first trial. When Officer Jeselson first directed his fellow officer to stick his hand out of the window of the parked car and the prosecutor saw the officer's hand, "that's when [the prosecutor] confessed" to Officer Jeselson and Ms. Badger, "[t]hank goodness my nightmare has not been realized."

When the prosecutor objected that defense counsel was mischaracterizing an aspect of what the prosecutor had stated, counsel conceded that the prosecutor was correct. But in an apparent reference to the prosecutor's representations to the court outside the presence of the jury, counsel asserted "[t]hat's why [the prosecutor] needs to be a witness, because what we have is unsworn self-serving testimony to explain the unexplainable." Continuing in that vein, counsel argued that "[the prosecutor] should be a witness in this case, and the defendant should have a mistrial." At no point, however, did counsel state that the defense wanted or intended to call the prosecutor as a witness. Nor did counsel argue that the People should be required to call the prosecutor as a witness on account of Ms. Badger's testimony or that the alleged misconduct consisted of the People's failure to call the prosecutor as a witness. Even more to the point, counsel never argued that a mistrial was required because counsel planned to argue in his summation that the prosecutor had committed misconduct and the prosecutor could not properly defend himself in response. After additional argument, the court denied the motion for a mistrial.

During summation, defense counsel accused Officer Jeselson of perjury. Referring to Ms. Badger, defense counsel stated: "We

know who Ms. Badger is. Ms. Badger is their expert. She works for Mr. Morgenthau. She told you Mr. Morgenthau expects a high level of integrity from the people who work for him. Very important because Mr. Morgenthau has a great level of integrity."

At the same time, however, defense counsel clearly accused the prosecutor of complicity in the perjury allegedly committed by Officer Jeselson. Thus, counsel asked who was committing perjury, Officer Jeselson or a veteran photographer. Then, counsel stated:

> "[The prosecutor] will tell you this . . .
>
> "Defense calls witnesses and they lie, the prosecution calls it perjury. When the prosecution calls witnesses that lie they call it inconsistencies . . .
>
> *"[The prosecutor] tried to get back up and straighten it out. He knew what was going on. He had to fix it. He was there, wasn't he. According to Ms. Badger, according to Officer Jeselson standing right there. The case is going down the drain. So what does he do? He doesn't throw the towel in, no. He gets up. Set up question:*
>
> 'Question: Ms. Badger, perhaps it wasn't clear—' [W]hat wasn't clear? Who told him to move the car? What was unclear about that? Let's clear it up. He's throwing the witness a signal we made a mistake. You weren't supposed to say that. If that's not true, when [the prosecutor] is up here ask him as you are listening to his arguments what part of [defense counsel's] question and what answer wasn't clear?" (Emphasis added.)

Although defendant asserts on appeal that "the defense did not impune [*sic*] the character of the trial prosecutor," from the italicized language alone it is clear that defense counsel argued that the prosecutor was complicit in the alleged perjury of Officer Jeselson and had corruptly endeavored to alter Ms. Badger's testimony.

Defense counsel continued this same theme. According to counsel, the prosecutor was trying to "play with the facts." On the mere basis of the prosecutor's question asking Ms. Badger if Officer Jeselson gave instructions to the officer in the car to stick his hand out the window, counsel maintained that the prosecutor "wants to argue they were talking about parking."

Counsel then went on to give the following explanation of what happened when Ms. Badger did not take the prosecutor's "hint" that she had said something she should not have said: "[The prosecutor] thought he was out. The witness didn't get the hint. The witness testified with the type of integrity that Mr. Morgenthau would expect of one of his employees, and the answer was yes. She was telling the truth."

Without question, these unsubtle accusations of gross if not criminal prosecutorial misconduct invited a vigorous response (*People v Nai Hing Liang*, 208 AD2d 401, 402 [1994]). In his response, the prosecutor argued that Officer Jeselson had not had an opportunity to frame defendant, because his acts during the photographic re-creation at the observation post were being witnessed by an assistant district attorney. He invited the jury to examine the photographs, arguing that they showed that defense counsel's theory was wrong.

The prosecutor then stated that, if the defense theory were correct, both he and Officer Jeselson had performed intolerable acts and should be fired:

> "[THE PROSECUTOR]: [Defense counsel] spoke about people on that roof. . . . Officer Jeselson was on that roof, the photographer . . . was on the roof, and I was on that roof. Now, if he is directing something improperly, that is Officer Jeselson, well, it's in front of me.
>
> "And if he knew he was going to get away with it when I say that's the opportunity, you know [defense counsel] talked a lot about people losing their jobs about perjuring themselves, about the integrity of Robert Morgenthau's office. Well, if Officer Jeselson thought he was going to get away with it—
>
> "[DEFENSE COUNSEL]: [The prosecutor] is vouching for his witness.
>
> "THE COURT: Overruled.
>
> "[DEFENSE COUNSEL]: He is vouching for his witness . . .
>
> "THE COURT: Overruled.
>
> "[THE PROSECUTOR]: If Officer Jeselson thought he was going to get away with it with me present, all that talk about firing, that should be me because I'm prosecuting this case, not Officer Jeselson.

"[DEFENSE COUNSEL]: That's objectionable vouching for his witness.

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: Your Honor, he is making himself an unsworn witness for the credibility of his police officer.

"THE COURT: Overruled.

"[THE PROSECUTOR]: Ladies and gentlemen, Mr. Morgenthau should fire me if Officer Jeselson thinks he is going to be able to say that in court, lie to you, when the person who is standing right next to him on that roof is me. Well, that lies with me.

"So what's the explanation? If there's no motive, no opportunity for why Ms. Badger remembers it differently. Well, there's evidence that you heard the officer was on the roof. Evidence that you heard I was on the roof also. I have no other answer other than the fact that she is mistaken.

"[DEFENSE COUNSEL]: Objection, Judge—

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: He is vouching for his witness using the pronoun I.

"THE COURT: Members of the jury, you can accept his argument as to what happened on the roof [i.e., observation post]. It's his argument based upon the evidence as he recalls it.

"[THE PROSECUTOR]: As a matter of fact, that's what I'm doing."

Before discussing defendant's claim of prosecutorial misconduct, it should be emphasized that the prosecutor then went on to advance numerous arguments, grounded squarely in the evidence, in support of his position that it made no sense to think that Officer Jeselson had committed perjury and falsely accused defendant of a crime. Notably, defendant does not contend on appeal that any of those arguments were at all improper.

After the trial, defense counsel moved to set aside the verdict based on prosecutorial misconduct. Counsel argued that the prosecutor impermissibly vouched for his witness, Officer Jeselson, by stating that he, the prosecutor, should be fired if he had permitted the officer to lie.

In a written decision, Justice Bradley denied the motion. After noting that Ms. Badger's testimony "was clearly unexpected by the [prosecutor]," the court observed that defense counsel's summation "impugn[ed] the truthfulness of the prosecuting attorney, implying he . . . tolerated a lack of truthfulness and proper procedure by Officer Jeselson." After surveying the relevant law, the court concluded as follows:

> "Viewed in a vacuum, the prosecuting attorney's comments are objectionable. However, viewed as a response to the defense counsel's inappropriate summation, they do not rise to the level of reversible error. The defense counsel brought to the attention of the jury the prosecutor's presence on the roof [i.e., observation post] for the photography session, and then directly used that presence to challenge his veracity, and accuse him of importuning a witness to change her testimony and commit perjury. Against this background, while the prosecutor might have shown greater restraint, his comments do not require reversal, particularly in light of the instructions this Court gave to the jury concerning the fact that statements made by the prosecutor in summation were mere argument based on the evidence, and in light of the fact that evidence of guilt in this case was strong."

I agree with Justice Bradley's reasoning and his conclusion that the prosecutor did not commit reversible error. Before discussing the majority's writing, however, several additional points should be made.

First, as the People observe, the prosecutor could not responsibly have refused the invitation to respond to defense counsel's personal attacks on his integrity. Because counsel's attack also challenged the veracity of the People's chief witness, a failure to respond could have been seen as a tacit admission that may have inspired an unjustified acquittal. Given that some response to counsel's personal attack unquestionably was warranted, it is difficult to conceive of any response that could not be criticized as "vouching" for Officer Jeselson. For example, the prosecutor might have noted that defense counsel was assailing both his and Officer Jeselson's integrity and responded by saying: "I will not dignify these accusations with a response." Even that statement would be tantamount to an implicit denial by the prosecutor of counsel's charges of

misconduct. As discussed below, moreover, the case law is clear that the prosecutor was not required to suffer defense counsel's personal accusations in silence.

Second, in the course of defending himself, the prosecutor did not "testify" by making any statements about his recollection of the events that took place when the photographs were taken in the observation post. Rather, he offered to the jury the obvious and only alternative rejoinder to the defense claim of perjury, that Ms. Badger was mistaken. As noted above, the prosecutor then supported the contention that she was mistaken by advancing numerous arguments grounded in the evidence rebutting the defense claim of perjury.

Third, much of the prosecutor's response was devoted to pointing out the contradiction inherent in the defense claim of perjury. Defense counsel asked Ms. Badger on cross-examination if she wanted to keep her job at Mr. Morgenthau's office and lauded that office and Mr. Morgenthau for having "a great level of integrity." Of course, however, the prosecutor worked for the same office and the prosecutor made the obvious point that defense counsel could not have his cake and eat it too. That is, defense counsel could not consistently argue that Ms. Badger was believable because of where she worked even as he argued that her fellow employee had orchestrated perjurious testimony. Thus, the prosecutor noted that, were he responsible for aiding false testimony, he would not be fit to work at his office.

Fourth, I break no new ground in concluding that the prosecutor's summation does not warrant a reversal of defendant's conviction. To the contrary, *People v Marks* (6 NY2d 67 [1959], *cert denied* 362 US 912 [1960]) is right on point. In *Marks,*

> "[d]efense counsel had told the jury in no uncertain terms that . . . witnesses had been suborned by the District Attorney's office acting in conjunction with the police, by coercing them into giving false testimony implicating the defendant . . . The reputations of the Assistant District Attorney in charge of the case, of the District Attorney's office and of the police were thus injected into the case by the defendant's attorney . . . Having made these gratuitous attacks upon the law enforcement authorities, appellant's counsel is not in position to complain that the prosecuting [attorney] said that his reputation and the reputation of the police were involved in the case" (6 NY2d at 77-78).

Defendant's effort to distinguish *Marks* is frivolous. Contrary to defendant's brief, defense counsel certainly did "impu[gn] the character of the trial prosecutor" in his summation. As the People correctly argue, that the prosecutor in this case was charged by defense counsel with encouraging and covering up perjury, rather than coercing perjury, is a distinction without a difference. Here, as in *Marks*, the prosecutor could fairly respond that he personally had been attacked and invite the jury to question the validity of those attacks.

The Second Circuit's decision in *United States v Thai* (29 F3d 785 [1994], *cert denied sub nom. Lan Ngoc Tran v United States*, 513 US 977 [1994]) also is on point. As the court stated:

> "A prosecutor may not properly vouch for the credibility of a witness. However, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case . . . and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion" (29 F3d at 807 [citations and internal quotation marks omitted]).

In *Thai*, "the integrity of the prosecutors had repeatedly been impugned" (*id.*). On the government's rebuttal summation, the Assistant United States Attorney argued as follows about her coprosecutor:

"What do you think [the prosecutor] is interested in? Do you think that he is interested in a fabricated or a shaded version of events?

"Do you think that he's interested in slanting things before you?" (*Id.*)

With respect to these comments, the court rejected the defendant's claim of prosecutorial misconduct, and ruled that "[i]n light of defendants' attacks, we conclude that this relatively mild response was not improper" (*id.*).

Here, too, the prosecutor's response was "relatively mild." As did the prosecutor in *Thai* with the rhetorical questions posed on rebuttal and the prosecutor in *Marks* with the statement that his reputation was involved, the prosecutor implicitly denied the charges of misconduct when he stated that he should be fired if he had been complicit in the alleged perjury. Like the prosecutors in *Thai* and *Marks*, moreover, the prosecutor did not "testify" to any personal knowledge.

Fifth, and finally, as this Court has stated,

> "[i]solated instances of prosecutorial misconduct on summation are insufficient to justify reversal in the absence of an obdurate pattern of inflammatory remarks throughout the prosecutor's summation . . . or unless the prosecutorial misconduct is so pervasive, so egregious and the prosecutor's disregard of the court's ruling and warnings is . . . deliberate and reprehensible" (*People v D'Alessandro*, 184 AD2d 114, 118-119 [1992] [internal quotation marks and citations omitted], *lv denied* 81 NY2d 884 [1993]).

Even if the prosecutor fairly could be condemned for implicitly denying the gross misconduct that defense counsel charged him with committing, in no event did the prosecutor's summation sink to the level of the pervasive or egregious misconduct that warrants reversal. The majority pays no heed either to *D'Alessandro* or, as Justice Bradley stated, "the fact that evidence of guilt in this case was strong."

The majority asserts that the prosecutor "interjected his personal integrity and the veracity of the District Attorney's office into his summation to support the credibility of Police Officer Jeselson." But the majority thus disregards the fact that defense counsel was the one who first injected into the case the issues of the prosecutor's personal integrity and the integrity of the District Attorney's office, assailing the former and praising the latter. The case the majority relies upon, *People v Lovello* (1 NY2d 436 [1956]), is distinguishable for precisely this reason. Far from attacking the prosecutor's integrity in *Lovello*, defense counsel's summation merely "criticized the prosecutor for failing to have and produce stenographic minutes of defendant's alleged police station statement, although a stenographer had been present when that statement was allegedly made to police officers . . . and to the prosecutor" (*id.* at 438).

For the same reason—defense counsel unquestionably launched a personal and unwarranted attack on the prosecutor's integrity—the majority's effort to distinguish *Marks* (*supra*) is unpersuasive. The majority also is of the view that *Marks* is "easily distinguishable" because "Officer Jeselson's credibility was at the crux of the case." The majority's implicit contention that in *Marks* the perjury allegedly suborned by the prosecutor was not "at the crux of the case" is at odds with the Court's statement of the extent of the alleged perjury: "[t]he People's

principal witness . . . , and other witnesses for the prosecution, were dope addicts. Defense counsel had told the jury in no uncertain terms that these witnesses had been suborned by the District Attorney's office" (*Marks,* 6 NY2d at 77).

The majority also contends that "defense counsel correctly suggested that, because only one of the statements could be true, one of the witnesses [Ms. Badger or Officer Jeselson] was *possibly* committing perjury" (emphasis added). With respect, this effort to sugarcoat defense counsel's conduct is not supported by any rational reading of defense counsel's summation. In fact, defense counsel's "suggestion" was a blatant accusation that Officer Jeselson had committed perjury and the prosecutor had suborned it. That accusation was improper and insupportable precisely because it wrongly excluded the obvious possibility that one of the witnesses simply was mistaken. Indeed, as Justice Sullivan observed in the course of reviewing numerous decisions of this Court, a prosecutor acts improperly when he or she asks the defendant to characterize the testimony of a prosecution witness as a lie even though the testimony is "susceptible to the suggestion that the witness[ ] spoke out of mistake or hazy recollection" (*People v Overlee,* 236 AD2d 133, 139 [1997], *lv denied* 91 NY2d 976 [1998]; *cf. People v Ball,* 77 AD2d 625, 625 [1980] ["It was . . . improper and highly prejudicial for the prosecutor, in his summation, to tell the jury that a vote of not guilty was the equivalent of saying that the two identifying witnesses had lied. The statement distorted the issue . . . and may well have led the jury to believe that there was no possibility that the witnesses were mistaken"]).

The majority also writes that "[a]fter the court denied a mistrial, defense counsel properly pointed to the conflicting testimony, and *suggested* that the police officer witness had lied with the prosecutor's complicity" (emphasis added). With the italicized verb the majority again tries to put a benign spin on an unequivocal accusation of gross misconduct.[1] To the extent the majority is of the view that defense counsel's "suggest[ion]" was proper, I emphatically disagree. In rushing to accuse the prosecutor of suborning perjury, defense counsel improperly ignored the obvious possibility that Ms. Badger was mistaken.

---

1. As noted, defense counsel also asserted in his summation that the prosecutor had been "throwing the witness [i.e., Ms. Badger] a signal we made a mistake. You weren't supposed to say that." Even with respect to this clear charge that the prosecutor had been encouraging perjury, the majority attributes to defense counsel a mere "suggest[ion]" of misconduct.

To be sure, defense counsel was not required to concede that Ms. Badger had been mistaken. But defense counsel did more than argue that Officer Jeselson had committed perjury: he leaped to the conclusion that the prosecutor was complicit in the alleged perjury. Whether defense counsel's attack was wholly gratuitous or merely reckless need not be debated. Rather, as in *Marks*, defendant is not in a position to complain that the prosecutor defended himself against defense counsel's personal attack.

At the outset of its writing the majority states that "[t]his is a case where the People created the situation by eliciting conflicting testimony from their own witnesses, and then attempted to correct the situation at sidebar by vouching to the court for the witness whose testimony was more likely to secure them a conviction." If the first clause of this sentence is meant to suggest that the prosecutor invited the personal attack by defense counsel on his integrity, that suggestion would be insupportable even without regard to the trial court's observation that the prosecutor was surprised by Ms. Badger's testimony. The second clause is baffling, and not solely because of the irrelevance of what the prosecutor said to the court when the sole issue is whether the prosecutor was justified in what he said to the jury. Even though the prosecutor was not addressing the trier of fact, the majority tars him with "vouching" for Officer Jeselson. Even though the prosecutor was outside the presence of the jury, and despite the fact that he was responding to the motion by defense counsel "for a mistrial based upon prosecutorial misconduct," the majority thus takes the position that the prosecutor could not properly defend himself against counsel's personal attack on his integrity. I respectfully submit that nothing in law or common sense supports that position.

One final point about the majority's writing should be made. When the prosecutor argued on summation that Ms. Badger was mistaken and defense counsel objected that the prosecutor's use of the pronoun "I" constituted vouching, the trial court stated as follows: "Members of the jury, you can accept this argument as to what happened on the roof. It's his argument based on the evidence as he recalls it." According to the majority, the trial court thus "gave its imprimatur to the prosecutor as [an] unsworn witness." I respectfully disagree. The far more reasonable reading of the court's statement is that the court was instructing the jury that the prosecutor's argument could be accepted if it was based on the evidence. Notably, defense

counsel—who was not at all timorous about voicing protests to the court's rulings—voiced no objection to the court's instruction. Moreover, in its charge to the jury the trial court correctly instructed the jury on this subject at length. Thus, the court stated, inter alia, that:

> "Your own recollection, understanding and evaluation of the facts presented by evidence at this trial is what controls regardless of what counsel on either side of the case may say about the facts and even regardless of what I may say about the facts. . . .

> "You are not bound to accept the arguments of either counsel. If you find that any argument urged by either of them was reasonable and logical and based upon the evidence as you recall it and is consistent with that evidence, you are free to accept that argument as your own and to give it such weight as you may deem advisable.

> "On the other hand, if you find that any argument or conclusion is not based upon the evidence or that it is unreasonable, illogical or inconsistent with the evidence, you may disregard it entirely."

Especially given these clear instructions, the jury could not have misunderstood the trial court to have endorsed the prosecutor's argument. The majority wrongly imputes an elementary mistake to a highly experienced trial judge with its conclusion to the contrary.[2]

Finally, I would reject defendant's other claims of error. Given the majority's resolution of defendant's claim of prosecutorial misconduct, discussing those other claims would be pointless.

---

**2.** The majority states that "[t]he visibility of the exchange [between Mumford and defendant] was crucial to the People's case, particularly since that was the issue that had prompted a mistrial." Similarly, the majority states that the prosecutor "kn[e]w[ ] that the same issue of whether Police Officer Jeselson was in a position to witness the defendant handing the codefendant drugs in exchange for money had led to a mistrial the first time around." My analysis would be unaffected even if the majority is correct with respect to why the first trial ended in a mistrial. But the majority's account of what prompted the mistrial and what the prosecutor knew about what had prompted the mistrial is nothing more than speculation. Not surprisingly, the majority's account goes unexplained and unsupported. Nothing in the current record, however, sheds any light on why the mistrial was granted. The record on appeal in this case includes from the first trial only the opening statements and testimony.

Friedman, J.P., and Buckley, J., concur with Catterson, J.; Nardelli and McGuire, JJ., dissent in a separate opinion by McGuire, J.

Judgment, Supreme Court, New York County, rendered June 16, 2004, reversed, on the law, the judgment vacated and the matter remanded for a new trial.